6584

### LYON v. CHARLESTON AND WESTERN CAROLINA RY.

1. MASTER AND SERVANT—RAILROADS—NEGLIGENCE.—That a conductor ordered a brakeman and a flagman to uncouple several cars from his train, which were provided with a lever for uncoupling from the side, and the use of which the flagman knew; that the flagman got on the flat car to be uncoupled, and when the brakeman failed to work the lever from the ground, he, without signalling, stooped down on the flat car, reached over and caught the lever on the other side, and when in that position a sudden jerk of the engine threw him under the trucks of the following car, which ran over and injured him, is not negligence of the master; nor was it duty of the conductor to stand by and see that the flagman obeyed his order to uncouple in the safe way, when servant knew that way.

2. FELLOW-SERVANTS.—A flagman who was instructed by the master to obey the orders of the conductor and engineer, while conductor is in charge of train, and while obeying his orders, is a fellow-servant with the engineer on that train.

3. RAILROADS — BRAKES — NEGLIGENCE — CONTRIBUTORY NEGLIGENCE.— Under the facts in this case, the failure of the carrier to have the cars in a train equipped with air-brakes associated together and operated from the engine, as required by act of Congress, was not the proximate cause of the servant's injury, and such failure cannot be assigned as negligence to this servant, as his injury, if not caused by his own negligence, was caused by his contributory negligence.

4. ISSUES—SUPREME COURT—NEGLIGENCE.—Where the evidence of the plaintiff, in the opinion of this Court, admits of no other inference than that his own negligence contributed to his injury as a proximate cause, a question of law arises, and it is the duty of the Court to reverse the judgment below and grant a new trial, notwithstanding the trial Judge and jury both took a different view.

5 MASTER AND SERVANT—RISKS.—In order to make applicable the rule that the servant does not take upon himself risks which he would not reasonably expect to encounter because not within the scope of his contract, it must be shown that the servant was transferred to essentially new duties and that the order under which he acted was negligent. In this case the servant was injured while performing duties embraced in his employment as flagman—uncoupling cars under order of conductor.

MR. JUSTICE GARY dissents, and thinks the issue of plaintiff's negligence was properly submitted to the jury.


Before MEMMINGER, J., Greenwood, October Term, 1905. Reversed.


Action by A. B. Lyon against Charleston and Western Carolina Ry. From judgment for plaintiff, defendant appeals.


Messrs. S. J. Simpson and McGhee & Richardson, for appellant.


Mr. Simpson cites: Compliance with act of Congress had nothing to do with plaintiff's injury: 2 Thomp. on Trials, secs. 2309, 2310, 2315; 11 Ency., 516; 56 S. C., 434; 61

S. C., 563. *Flagman and engineer are fellow-servants:*
72 S. C., 243; 5 Rap. & Mack's Dig. Ry. Law, 740; 31 Fed.
R., 527; 72 Ill., 512, 285; 67 Miss., 255; 67 Barb., 96; 39
N. Y., 468; 37 Ohio St., 665; 10 Lea, 741; 85 Tenn., 227;
13 Lea, 423; 14 Lea, 374; 15 Lea, 145; 67 Tex., 238; 2 Lab.
on M. & S., sec. 745b. *As to assumption of risks:* 15 S. C.,
456; 1 Lab. on M. & S., sec. 465.

*Messrs. McGhee & Richardson* cite: *Was engineer negli-*
*gent?* 55 S. C., 839. *Negligence in giving orders:* 48 S. C.,
388; 68 S. C., 411; 45 S. C., 280. *As to proximate cause:*
54 S. C., 503; 57 S. C., 435; 71 S. C., 58. *Fellow-servants:*
56 S. C., 455; 51 S. C., 91; 40 S. C., 104. *Rule which ap-*
*plies to complaints on demurrer should be applied to evi-*
*dence here:* 58 S. C., 491; 64 S. C., 561; 69 S. C., 480;
55 S. C., 179.

*Messrs. Grier & Park,* contra, cite: *Evidence objected to*
*in exception I was competent:* 52 S. C., 17; 53 S. C., 258;
73 S. C., 233; 51 S. C., 486; 70 S. C., 11; 50 S. C., 129;
48 S. C., 337; 52 S. C., 193. *Violation of safety appliance*
*act was raised by pleadings, and charge thereon was proper:*
67 S. C., 462; 68 S. C., 323; 64 S. C., 112; 31 S. C., 137;
40 S. C., 153; 29 S. C., 322; 55 S. C., 585. *As to assump-*
*tion of risks:* 68 S. C., 55; 20 Ency., 132. *Master is liable*
*for injury to servant by performing order of conductor in*
*his presence:* 12 Ency., 120; 68 S. C., 55; 21 Ency., 494.
*Power of this Court to determine the question of negligence*
*on a given state of facts:* 51 S. C., 245; 21 S. C., 104; 25
S. C., 59, 30; 41 S. C., 454, 19, 420; 51 S. C., 460; 61 S.
C., 487; 71 S. C., 159; 74 S. C., 142. *Contributory negli-*
*gence cannot be considered on motion for nonsuit:* 5 S. C.,
227; 19 S. C., 24; 34 S. C., 215; 23 S. C., 537, 289; 25
S. C., 128; 29 S. C., 319; 42 S. C., 468; 45 S. C., 183;
62 S. C., 136; 46 S. C., 216; 56 S. C., 94. *Right of trial*
*by jury:* Art. I, sec. 25, Con. 1895; art. I, sec. 11, Con.

1868; 17 S. C., 542; 35 S. C., 352; 57 S. C., 171; 26 S. C., 351; 24 S. C., 161; art. IX, sec. 6, Con. 1790.

The opinion herein was handed down December 16, 1906, but on petition for rehearing case was ordered reargued at April Term, 1907.

July 10, 1907. The opinion of the Court was delivered by

MR. JUSTICE WOODS. The vital question in this case is whether the Circuit Judge erred in refusing a motion for a nonsuit and for new trial.

The plaintiff, a flagman on defendant's freight train, while attempting to uncouple a moving car, fell on the track and had his leg crushed. He brought this action for damages and recovered judgment, alleging the accident was due to the defendant's negligence. Without taking up the exceptions in detail, we consider whether there is evidence to support any one of the several charges of negligence as a proximate cause of the injury. The case depends principally on the testimony of the plaintiff, who gave this account of the accident on his direct examination: "What did you do? We went and unloaded all of the freight that was for Hampton, and the conductor got out of the car and signed the engineer ahead, and the train rolled off at the rate of about three or four miles an hour. He ordered Stephen New, the brakeman, and myself, to cut the flat car loose, and let the rear of the train trail behind and roll clear of the siding, put the flat car in the side track, and come back to the main line and get the train and go on to Brunson to meet 41, a passenger train. Stephen New went and caught hold of the lever on the cattle car to cut it loose from the flat. The lever was hard to work and it seemed like it was impossible for him to cut the car, and I knew I could not, and I crossed over to the corner of the flat car and pulled the lever, and a jerk from the car threw me under the rolling train behind. There was no air on the train.

"What happened when you fell under there? The front trucks of the cattle car rolled over me, broke my leg, fractured my hip and ankle, broke my collar-bone, and bruised my shoulder, and cut a gash in my head." On cross-examination, he says: "Just state again how it happened; where were you and what were you undertaking to do, to carry out the conductor's orders? Just tell what you were doing. Stephen New, when we got orders, he went over and caught hold of the lever on the cattle car and was pulling it. Was the lever on the cattle car so that you could stand on the outside, without going in between the cars and uncouple it, one of those iron automatic levers? Yes, sir; it don't set outside the car, it sets in between. You can stand outside of the car without going in between them? Yes, sir. And you intended to turn that lever over and raise the peg up and uncouple the car? That was Steve New's idea, and it seemed he could not work his lever. When Steve New caught hold of that lever, where were you? On the flat car. Why did you get on the flat car? I was going down with the train, and when it got near the siding I was going to get on the top of the cattle car and apply the brakes, as ordered to do. How were you going to get across the gap between the flat car and the cattle car? Several ways; I could have got down on the ground and got up, or I could have reached over and got the ladder. You knew that Steve New was going to separate them as soon as he could? He was getting pretty close to the clear post, and he had not got them loose, and I just pulled the lever on the flat car. When Steve New first caught hold of the lever where were you? I was on the flat car. You got on the flat car? I was already on the flat car. I just got up to ride on down. There was not any need of my trotting beside it. You got on the flat car the first thing you did, before Steve New caught hold of the lever; that is true, is it not? I don't recollect about that. You knew that as soon as Steve New worked that lever, if it worked all right, the cars would separate? Yes, sir; but as I cut the car I was expecting to give my own

signals, but it was done before I could do it. I thought you said that Steve New was going to cut the car off? I said he was trying to pull it up and it looked like he could not get the lever to work, and I pulled the lever on the flat car. But when you went on the flat car, you did not intend to have anything to do with the lever? I was going to carry out the orders of the conductor. Didn't you, when you got on the flat car, think that Steve New would operate the lever so as to separate the cars? I knew that was his intention, sir. And at that time you did not intend to have anything to do with uncoupling the cars? I was going to carry out the orders of the conductor, and I could not have done it otherwise. But when you got on the flat car, your intention was that Steve New should do the uncoupling, and then you were to get over on the other car and put on brakes? Yes, sir; but when he could not do it, there was but one lever on his side, and I was compelled to pull the lever. And when he had difficulty in uncoupling, you undertook to help him? Yes, sir."

Negligence as a proximate cause of the injury is charged against the conductor, in that he "ordered, required and directed this plaintiff to get upon and uncouple the said cars while in motion, and get upon and apply the brakes to the trailing cars while in motion, and in leaving the train without seeing that his orders were carried out and the train operated with due care, without a sudden increase of the speed of the train."

The plaintiff's own account shows clearly the accident was due to his act of leaning over the corner of the moving car and uncoupling it by pulling a lever at the side. But there is no evidence whatever that the conductor ordered the plaintiff to get upon the moving car and uncouple it from that position, or even saw him when he did it. There is evidence of an order from the conductor to uncouple the moving car, but a lever was provided on each side of the car as a means of uncoupling from the ground. That the plaintiff, as well as New, understood the order to mean that the

lever should be used from the ground is conclusively shown by his evidence that they went about the uncoupling in that manner—New handling the lever and the plaintiff mounting the car in order to leap over on another car and put on the brakes as New uncoupled.

New, the brakeman, made an unsuccessful effort to use the lever on his side from the ground, and then the plaintiff, without giving any signal to stop the train or *attempting to use the lever on the other side from the ground,* or even reporting to the conductor or receiving any order from him, of his own volition, without even giving notice to any one in control of the motion of the train of his intention, attempted the perilous feat, of stooping over from the moving car and pulling the lever below him.  There is no ground for saying the order of the conductor required or contemplated such peril.  Without doubt, when an order is given, it is the duty of the servant to take the safe way of carrying it out, if one is provided; and if that fails, he cannot, except, perhaps, in cases of emergency arising from the fault of the master, charge the master with the result of using a dangerous method not in the purview of the order.  If the order of the conductor could in any reasonable view be regarded as suggesting to the plaintiff to stand on the flat car and uncouple from that position, then there might be ground for saying that the defendant could not escape liability for a condition of things produced by its order to him, in which on a sudden impulse he took a dangerous course, resulting in his injury. But it would be beyond all reason to say the order contemplated mounting a flat car as the plaintiff did, with the intention of stepping or leaping from that to the following car, in order to apply the brakes to that car, or the attempt to use the lever while stooping from the end of the flat car.  Here then was a general order from the conductor to uncouple, and there was a lever provided for the purpose to be used from the ground, and if it had been used as intended by the defendant, the plaintiff could not have been injured by falling from the car.  This distinguishes the case from *Carson*

v. *Railway,* 68 S. C., 55, 68, 46 S. E., 525; for in that case the Court said: "It was shown, or rather there was testimony offered tending to show, that the conductor ordered this servant, the plaintiff, to couple those cars; that such conductor in this matter represented the master; that the servant called to such conductor to hold fast the train until he signaled; that this servant did not signal the conductor to move the train; that it was under these circumstances the train was moved so that the two cars bumped against each other, thus causing his injuries; that when the cotter-pin was out of its place, it would be necessary for a servant to go between the cars to arrange it; that it was necessary to go between the cars to open the instrument by which the coupling was made."

The conductor's position at the time of the accident does not appear from the evidence, and, therefore, there could be no finding of negligence on the ground that he was not present to direct the details of the uncoupling and the movements of the train. The plaintiff's testimony shows that he clearly understood the manner in which the lever was to be used, without any instruction or direction. That the master is not liable for any injury which results from the use of a safe appliance in an unsafe and dangerous manner not contemplated by him, seems too obvious to require a particular citation of authority. The cases will be found collected in 20 Am. & Eng. Ency., 141. No authority has been cited, and we think there is no foundation in reason for the proposition that though the plaintiff knew fully the safe and proper way to use this safe appliance, it was, nevertheless, the duty of the conductor to stand by him and see that whenever ordered to uncouple cars, the plaintiff should use with due care the safe means provided, and should not take the peril of an improper use of such means. The evidence of the plaintiff shows beyond doubt that he knew the safe way, and chose the dangerous.

The plaintiff further charged: "That the said defendant was further negligent, careless and reckless in the said en-

gineer in charge of the said engine, who was a superior officer and agent to the said plaintiff, and who had the right to direct the services of the said plaintiff, and who was in charge of the said train in the absence of the said conductor, gave the said train a sudden and violent lurch and start forward, without warning to the said plaintiff or signal from him, and while the said plaintiff was engaged in carrying out the directions and orders of the said defendant, and was in a dangerous position, which negligence, carelessness, and recklessness was a direct and proximate cause of the said injuries."

The general rule in this State and elsewhere is that an engineer is not ordinarily the representative of the master, but is the fellow-servant of the train hands—all being under the orders of the conductor, as the representative of the master. The plaintiff in this instance testified, however, that at the time of his employment as a flagman, he was told by the train master that he must obey the orders of the conductor or the engineer, and that accordingly he did obey, to use his own words, "the conductor when he needed my services and the engineer when he needed my services." The Constitution provides: "Every employee of any railroad corporation shall have the same rights and remedies for any injury suffered by him from the acts or omissions of said corporation or its employees as are allowed by the law to other persons who are not employees, when the injury results from the negligence of a superior agent or officer, or a person having a right to direct or control the services of a party injured, and also when the injury results from negligence of a fellow-servant engaged in another department of labor from that of the party injured, or of a fellow-servant on another train of cars, or one engaged about another piece of work."

Under this constitutional provision, in view of the plaintiff's evidence as to obeying the orders of the engineer, the question arises, whether in this case the engineer was a superior agent or officer, or person having the right to control

or direct the services of the plaintiff. Under a constitutional provision identical with ours, the Supreme Court of Mississippi held an engineer not to be a person having the right to control or direct the services of a brakeman. *Evans v. Railway*, 12 So., 581. In this State, the rule adopted is thus clearly stated in *Brabham* v. *Tel. Co.*, 71 S. C., 56, 50 S. E., 716, and is quoted and approved in *Martin* v. *Royster Guano Co.*, 72 S. C., 237, 243, 51 S. E., 680: "In determining who are fellow-servants, the test or rule in this State is not whether the servants are of different grade, rank or authority, one of them having the power to control and direct the services of the other, but the test is in the character of the act being performed by the offending servant, whether it was the performance of some duty the master owed to the injured servant, the performance of which duty the master had entrusted to the offending servant. In the case under consideration, there was no duty resting upon the defendant to give notice to the plaintiff, as the danger was not hidden or unusual, and the plaintiff had knowledge thereof." Assuming that the engineer was the offending servant, through whose negligence the plaintiff was injured, the whole evidence shows that, in accordance with the well understood custom, the master had entrusted to the conductor, and not the engineer, the duty of giving orders for the shifting and coupling of cars, and there was no evidence that the conductor was absent and the train in the charge of the engineer. Therefore, in carrying out the conductor's orders, the plaintiff was not at the time under the engineer, as a person having the right to direct or control his services, but was under the conductor, and hence was a fellow-servant of the engineer on the same train.

But, in addition to this, we do not see how negligence can be imputed to the engineer as the proximate cause of the injury. The plaintiff, it is true, testified he fell on account of a sudden jerk of the train, but jerks are inevitable and are to be expected in movements of freight trains; *Steele* v. *R. R. Co.*, 55 S. C., 389, 33 S. E., 509; and there is nothing

22—77

in the evidence indicating the engineer had any reason to suspect the plaintiff was attempting to uncouple the cars while stooping over the corner of a moving car, or in any other position of danger. If the plaintiff had been on the side of the train uncoupling the car by the use of the lever from the ground, it would have been impossible for a sudden jerk to have precipitated him from the car under the wheels.

Another specification of negligence alleged as a proximate cause of the injury was a failure to have a sufficient number of cars "equipped with power driving wheel brakes and appliances, commonly known as air-brakes, as is required by law, and have air properly working for the operation of said brakes on said cars."

The sections of the Federal statute relating to interstate trains on which this allegation of negligence rests are as follows: "Sec. 1. That from and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power-driving wheel brake and appliances for operating the train brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring the brakeman to use the common hand-brake for that purpose. Sec. 2. That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the cars. * * * Sec. 8. That any employee of such common carrier who may be injured by any locomotive, car, or train in use contrary to the provisions of this act, shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such

carrier after the unlawful use of such locomotive, car or train had been brought to his knowledge." This statute was amended in 1903, section 2 of the amendment being: "That whenever as provided in said act any train is provided with power air-brakes, not less than fifty per centum of the cars in such train·shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power-braked cars in such train which are associated together with said fifty per centum shall have their brakes so used and operated; and to more fully carry into effect the objects of the said act, the Interstate Commerce Commission may, from time to time after full hearing, increase the minimum percentage of cars in any train required to be operated with power or train-brakes which must have their brakes used and operated as aforesaid; and the·failure to comply with any such requirement of the said Interstate Commission shall be subject to the like penalty as failure to comply with any requirement of this section."

This last section is the one most important to this discussion. Construing the original statute and the amendment together, it seems manifest under the amendment that Congress meant to establish the rule that railroads would comply with the provision of section 1 of the original act requiring the train to be under the control of the air-brakes operated by the engineer of the locomotive, and would not be liable under this act, if they had fifty per cent. of the cars equipped with power brakes used in operating by the engineer from the locomotive and all other cars on the same train and associated with these cars which might have been equipped· with power brakes also under like control of the engineer. The statute does not require all cars which may be equipped with power brakes to be coupled or associated together but only fifty per cent. of such cars, but it does require all that may have been equipped with power brakes and actually associated with fifty per cent. to be controlled by the engineer from the locomotive. The statute contemplates and allows that there may be cars in the train equipped with air-

brakes and not associated with the fifty per cent. operated from the engine. The word "associated," as here used, manifestly means the cars immediately connected with the fifty per cent. equipped with power brakes and operated from the engine; and those associated cars are also required to be operated from the engine. But the terms of the statute not only fail to require all cars of the train to be equipped with air-brakes operated from the engine, but impliedly excludes such requirement, by expressing the requirement that such cars when associated with the minimum number of cars shall be so equipped.

The number of deaths and physical injuries of railroad employees in this country had become so appalling as to shock the sensibilities of all civilized people, and the object of this legislation was to require the railroads to use the means prescribed in the statute as a reasonable precaution against such casualties; and as has been shown with great force by Chief Justice Fuller, in *Johnston* v. *Southern Pacific Co.,* 196 U. S., page 1, Courts should give the statutes a broad interpretation, having in view the benificent object of the legislation. Nevertheless, the statute fixes fifty per cent. as the proportion of the cars required to be equipped with air brakes operated from the engine, and in the face of this provision the Court would be going very far to hold it to be evidence of negligence under the statute not to have all the cars so equipped.

On this train there was a dummy—that is, a car not equipped with brakes, somewhere near the middle of the train; and the evidence made an issue of fact as to whether fifty per cent. of the cars of this train were so associated together as to have their brakes operated from the engine, as required by the statute.

If we assume, however, the defendant had not complied with the law, and fifty per cent. of the cars of the train were not so associated as to have the brakes operated from the engine, this omission to have fifty per cent. of the cars so operated had no connection with the plaintiff's fall and in-

jury, for the train consisted of from fourteen to sixteen cars, and all but five of these were between the engine and the flat car from which plaintiff fell, so that if the brakes of the eight cars connected together immediately behind the engine had all been operated from the engine, the car which ran over plaintiff's leg would not have been included in the number. Hence the plaintiff's evidence that if the car which he uncoupled had been equipped with air-brakes working from the engine it would have been stopped from running on him after he fell by the automatic action of the brakes, the instant it was uncoupled, cannot avail him. The statute did not require this car to be operated from the engine because it was not associated with the fifty per cent. required to be so operated, and the failure to have the eight associated cars next to the engine so operated had no connection with the accident. The presence of air-brakes operated from the engine could not have prevented the accident, and the absence of such equipment on these cars could have contributed nothing to it.

This case is entirely different from *Schlemmer* v. *Buffalo etc. R. R. Co.,* 27 Sup. Ct. Rep., 407, where the deceased was ordered by his superior to do the precise act in the doing of which he lost his life. The inadvertent placing his head above the coupling and its being caught were results likely to occur from the peril the deceased was required by the master's representative to take contrary to law. In the present case, as we have pointed out, the servant was injured in doing a negligent act not demanded or called for by the conductor, and which he well knew was not intended by the order he had received. This was therefore clearly contributory negligence as distinguished from assumption of risk. *Bodie* v. *Ry. Co.,* 61 S. C., 478, 39 S. E., 715; *Barkesdale* v. *Ry. Co.,* 66 S. C., 211, 44 S. E., 589; *Schlemmer* v. *Ry. Co., supra.*

We express no opinion as to the constitutionality of the Federal Statute, as that point is not made in the exception.

Aside from the statute, however, there was evidence that the safe and proper place for a dummy was at the rear of the train next to the cab, and that if it had been so placed, the air-brakes on the car uncoupled by the plaintiff would have worked automatically, so as to bring it to an almost instant stop, and thus probably would have prevented it from running over plaintiff when he uncoupled it and fell. If full credence and force be given to this evidence as tending to show that there was negligence on the part of the defendant in the management and arrangement of its cars and that such negligence was a proximate cause of the injury, the facts as stated by the plaintiff himself admit of no other inference than that his own negligence contributed to the injury as a proximate cause, without which it could not have been received. Knowing the cars to be arranged as they were, that hardly anything short of a miracle could save him from injury, if he fell between the moving cars; that it would be impossible for him to be so injured if he uncoupled by using the lever from the ground; he balanced himself in a stooping or kneeling posture on the corner of the moving flat car and uncoupled by reaching down to the lever. No reasonable man could fail to see the extreme peril, or doubt that it was extreme negligence to take it; and it is too plain for difference of opinion that this negligence contributed to the injury as a proximate cause and that without it the injury would not have been received. Taking the view of the evidence most favorable to the plaintiff, it cannot be doubted the facts conclusively show contributory negligence, and, therefore, under the principles laid down in *Jarrell* v. *Railway*, 58 S. C., 491, 36 S. E., 910, the plaintiff could not recover.

The general rule that it is the province of the jury to determine whether the evidence shows negligence on the part of the defendant or contributory negligence on the part of the plaintiff is universally recognized. Issues of negligence and contributory negligence are not different in this respect from other issues of fact be-

tween litigants. The rule is that all issues of fact in law cases are for the jury. Yet the rule is no less familiar and no less generally recognized that where there is a total failure of evidence on the part of the plaintiff to establish his case or full establishment of a complete defense by plaintiff's evidence, there is no longer an issue of fact, and it becomes the duty of the Court to adjudicate the matter as on issue of law by granting a nonsuit or directing a verdict or ordering a new trial. To illustrate: If A sues B on a contract for the payment of money and makes proof of existence of the obligation, but introduces evidence which admits of no other inference than that the obligation had been discharged, could the proposition be entertained for a moment that the Court would not have the power to dispose of the cause by nonsuit just as if the plaintiff had failed completely to offer evidence tending to prove that an obligation ever existed? In *Hutchison* v. *Noland,* 1 Hill, 222, the Court says: "The general rule certainly is that the plaintiff is not to be nonsuited on what constitutes the defendant's defense, but the rule applies only where the decision goes on the defendant's evidence. In such case the jury alone can decide. But if the defendant's defense be establishd by the plaintiff's witness, then the objection does not apply." *Pool* v. *R. R. Co.,* 23 S. C., 289; *Slater* v. *R. R. Co.,* 29 S. C., 100, 6 S. E., 936.

The principle is the same in issues of negligence. This Court has never hesitated to hold a nonsuit proper where the plaintiff failed completely to offer evidence tending to prove negligence as a proximate cause of alleged injury. *Carrier* v. *Dorrance,* 19 S. C., 32; *Hale* v. *Ry. Co.,* 34 S. C., 292, 13 S. E., 537; *Glenn* v. *R. R. Co.,* 21 S. C., 470; *Davis* v. *R. R. Co.,* 21 S. C., 103; *Pickens* v. *R. R. Co.,* 54 S. C., 509, 32 S. E., 567. In *Hooper* v. *R. R. Co.,* 21 S. C., 548, this language is quoted with approval: "The Judge has to say whether any facts have been established by evidence, from which negligence *may be* reasonably inferred; the jurors have to say whether, from these facts, when sub-

mitted to them, negligence ought to be inferred. The relevancy of evidence, and whether any exists which tends to prove, or is capable of proving, negligence, is for the Court."

We can see no possible ground on which the power and duty of the Court to grant a nonsuit can be distinguished and denied where plaintiff proves the negligence of the defendant as a proximate cause and at the same time makes good the defense of contributory negligence by introducing evidence which admits of no other inference than that his own negligence contributed to the injury as a proximate cause. It is true in *Carter* v. *R. R. Co.,* 19 S. C., 24, the Circuit Court was held to be without power to grant a nonsuit on proof by plaintiff of contributory negligence, and the authority of this case is recognized in *Darwin* v. *R. R. Co.,* 23 S. C., 537; *Petrie* v. *R. R. Co.,* 29 S. C., 322, 7 S. E., 515; *Carter* v. *Oil Mill,* 34 S. C., 215, 13 S. E., 419; *Whaley* v. *Bartlett,* 42 S. C., 468, 20 S. E., 745; and *Hankinson* v. *R. R. Co.,* 41 S. C., 19, 19 S. E., 206. A careful review of these cases suggests that the leading idea in the mind of the Court was that the Court could not under the Constitution hold, *a particular act or omission,* such for instance as a failure to look and listen, to be under all circumstances proof of contributry negligence as a matter of law. Be that as it may in the subsequent case of *Jarrell* v. *R. R. Co.,* 58 S. C., 495, 36 S. E., 910, the Court states the rule, applying the well recognized general principles to contributory negligence, "We may also say that while contributory negligence is ordinarily a matter of defense, yet if the complaint shows contributory negligence by plaintiff, that would render the complaint demurrable for insufficiency, since it contained allegations that would defeat the cause of action alleged, or prevent a recovery thereon." This case has been cited and approved in *Elkins* v. *Ry. Co.,* 64 S. C., 561, 43 S. E., 19; *Creech* v. *Ry.,* 66 S. C., 533, 45 S. E., 86; *Hunter* v. *Ry. Co.,* 72 S. C., 337, 51 S. E., 860.

The question in the Jarrell case arose on a demurrer, but on this point there is no ground for distinction between a

demurrer and a motion for a nonsuit.   It would not only
be illogical but inconceivable in any system of jurisprudence
that a Court should have power to dismiss an action on the
grounds that plaintiff has stated no cause of action, or stat-
ing it had also stated as a verity a complete defense to
it, assuming all his allegations of fact to be true; and yet
should be without power on proof of the truth of the same
allegations to adjudge as a matter of law that proof by the
plaintiff of the facts alleged constituted a complete defense
to his actions.   Cases in other jurisdictions laying down
the principles which we have stated will be found collected
in Sherman and Redfield on Negligence, section 114.

There is no difference in the application of the rule to
the plaintiff and the defendant.   If the defendant makes
out the *plaintiff's cause* of action either in contract or tort
by evidence which admits of no other inference than that
the plaintiff is entitled to recover, it is the duty of the Court
to direct a verdict for the plaintiff, leaving it to the jury if
the damages are unliquidated to fix the amount only.   This
is the principle applied to waiver in *Hollings* v. *Bankers,* 63
S. C., p. 193, 41 S. E., 90.

There are strong reasons for the great caution which this
Court has always exercised in the use of its power to reverse
a judgment of the Circuit Court refusing a nonsuit or a
new trial, or the direction of a verdict, on the ground that
the evidence admits no other inference than that there has
been a complete failure of proof to make out the plaintiff's
alleged cause of action, or that there had been complete
proof by the plaintiff of a defense set up in the answer.   But
the Court may not avoid the responsibility when a case like
this arises calling for the exercise of this power.   Juries
try issues of fact.   When the evidence makes no issue of
fact, it is the duty of the Court to announce the conclusion
of law which the evidence requires.

Another ground on which responsibility for the injury
was imputed to the defendant was set out in the twelfth
paragraph of the complaint: "That the said duties and work

assigned to the plaintiff on the occasion above described were not those plaintiff was ordinarily required to do in the scope of his employment as a flagman, but were unusual and outside of the ordinary duties of his employment, which, on the occasion in question, he was required to perform by the said defendant." The plaintiff testified he contracted to work as a flagman, his ordinary duties being to protect the rear of the train, to see that the lanterns and flags were placed, and the torpedoes and fusees were kept and used when needed, and to keep the cab clean; but he also testified that when he was employed he was charged by the train master to obey the conductor or the engineer, and he regarded it within the scope of his employment to perform other labor, such as unloading freight and uncoupling cars, when so directed by the conductor. It is clear from the evidence that in uncoupling cars the plaintiff was not acting within the scope of the duties he had contracted to perform without directions from the conductor, but it is also clear he was acting within the scope of duties he had undertaken when directed by the conductor to perform them. The general rule is well established that the servant does not take upon himself risks which he would not reasonably expect to encounter because not within the scope of his contract of hiring. But in order for this rule to be available it must be shown that the servant was transferred to essentially new duties and that the order under which he acted was negligent.

This is the view presented in Labatt on Master and Servants, sections 465 to 468, and it will be found very difficult to state a more accurate test, for from the nature of the subject each case must be decided on its own facts, whether the service required was essentially new and whether the order given was negligent are ordinarily questions of fact to be decided by the jury. But there are cases, and we think this is one of them, where it cannot be said there was any testimony upon which a finding could rest that the duty of uncoupling a car was essentially

new and not within the capacity of the plaintiff and not contemplated by his employment. The plaintiff had been employed on the freight train about three months and for some time before had been on the railroad bridge force; and his testimony already quoted shows that he had full knowledge of the purpose for which the lever was provided and that he used it in a way not contemplated by the company in placing it or by the conductor in giving his order; and the great and necessary danger of the method of use adopted by the plaintiff could not fail to be obvious to any reasonable man.

The conclusion is irresistible that the plaintiff's injury was due, if not solely to his own negligence, certainly to his contributory negligence, in taking unnecessary hazards to carry out the order of the conductor.

We do not deem it necessary to refer separately to the errors alleged in the charge and in the admission of the testimony, as the foregoing discussion practically disposes of all the material questions made in the case which arose either on the motion for nonsuit or for a new trial.

It is the judgment of this Court, that the judgment of the Circuit Court be reversed and the case remanded to that Court for a new trial.

MR. JUSTICE GARY, *dissenting*. While there was testimony tending to show that the plaintiff was negligent, it likewise tended to prove negligence on the part of the defendant in several particulars.

The testimony was susceptible of more than one inference; therefore, it cannot be said that the negligence of the plaintiff was the proximate cause of his injury, and the inference to be drawn from the testimony was properly submitted to the jury, especially when it appeared that the plaintiff did not have time for deliberation in executing the order to uncouple the cars.

But there is even a stronger reason why the question of contributory negligence on the part of the plaintiff was properly submitted to the jury.

This was an interstate commerce train, and the construction of the statute mentioned in the complaint, involves a Federal question, in which case, this Court is bound to follow the decisions of the United States Supreme Court.

There is no difference in principle between the present case and that of *Schlemmer* v. *R. R.,* 27 Sup. Ct. Rep., 407, from which we quote at length, as it is decisive of the question under consideration. The facts in that case were as follows: "This is an action for the death of the plaintiff's intestate, Adam M. Schlemmer, while trying to couple a shovel car to a caboose. A nonsuit was directed at the trial and the direction was sustained by the Supreme Court of the State. The shovel car was part of a train on its way through Pennsylvania, from a point in New York, and it was not equipped with an automatic coupler, in accordance with the act of March 2, 1893, chap. 196, sec. 2, 27 Stat. at L., 531, U. S. Comp. Stat., 1901, p. 3174. Instead of such a coupler, it had an iron drawbar fastened underneath the car by a pin, and projecting about a foot beyond the car. This drawbar weighed about eighty pounds, and its free end played up and down. On this end was an eye, and the coupling had to be done by lifting the free end possibly a foot, so that it should enter a slot in an automatic coupler on the caboose, and allow a pin to drop through the eye. Owing to the absence of buffers on the shovel car, and to its being so high that it would pass over those on the caboose, the car and caboose would crush any one between them if they came together, and the coupling failed to be made. Schlemmer was ordered to make the coupling as the train was slowly approaching the caboose. To do so he had to get between the cars, keeping below the level of the bottom of the shovel car. It was dusk, and in endeavoring to obey the order and to guide the drawbar, he rose a very little too

high, and, as he failed to hit the slot, the top of his head was crushed."

In reversing the decision of the State Court, the United States Supreme Court used this language: "It is enacted by section 8 of the act, that any employee injured by any car in use, contrary to the provisions of the act, shall not be deemed to have assumed the risk thereby occasioned, although continuing in the employment of the carrier after the unlawful use had been brought to his knowledge. An early, if not the earliest, application of the phrase 'assumption of risk' was the establishment of the exception to the liability of a master, for the negligence of his servant, when the person injured was a fellow servant of the negligent man. Whether an actual assumption by contract was supposed on grounds of economic theory, or the assumption was imputed because of a conception of justice and convenience, does not matter for the present purpose. Both reasons are suggested in the well known case of *Farewell* v. *Boston & W. R. Corp.*, 4 Met., 49, 57, 58, 38 Am. Dec., 339. But at the present time, the notion is not confined to risks of such negligence. It is extended, as in this statute it plainly is extended, to dangerous conditions, as of machinery, premises, and the like, which the injured party understood and appreciated, when he submitted his person to them. In this class of cases, the risk is said to be assumed, because a person who frankly and voluntarily encounters it, has only himself to thank if harm comes, on a general principle of law. Probably the modification of this general principle by some judicial decisions and by statutes like section 8, is due to an opinion that men who work with their hands, have not always the freedom and equality of position assumed by the doctrine of *laissez faire* to exist.

"Assumption of risk in a broad sense obviously shades into negligence, as commonly understood. Negligence consists in conduct which common experience, or the special knowledge of the actor, shows to be so likely to produce the result complained of, under the circumstances known to the

actor, that he is held answerable for that result, although it was not certain, intended, or foreseen. He is held to assume the risk upon the same ground. *Choctaw, O. & G. R. Co.* v. *McDade,* 191 U. S., 64, 68, 48 L. Ed., 96, 100, 24 Sup. Ct. Rep., 24. Apart from the notion of contract, rather shadowy as applied to this broad form of the latter conception, the practical difference of the two ideas, is in the degree of their proximity to the particular harm. The preliminary conduct of getting into the dangerous employment or relation is said to be accompanied by assumption of the risk. The act more immediately leading to a specific accident is called negligent. But the difference between the two is one of degree rather than of kind; and when a statute exonerates a servant from the former, if at the same time it leaves the defense of contributory negligence still open to the master (a matter upon which we express no opinion), then, unless great care be taken, the servant's rights will be sacrificed, by simply charging him with assumption of the risk under another name. Especially is this true in Pennsylvania, where some cases, at least, seem to have treated assumption of risk and negligence as convertible terms, *Patterson* v. *Pittsburg & C. R. Co.,* 76 Pa., 389, 18 Am. Rep., 412. We cannot help thinking that this has happened in the present case, as well as that the ruling upon Schlemmer's negligence, was so involved with, and dependent upon erroneous views of the statute, that if the judgment stood the statute would suffer a wound."

This decision shows that the United States Supreme Court regards as "shadowy" the distinction between the assumption of risk, and contributory negligence, and that it will not allow the provisions of the statute to be abrogated by a mere change of name, in the designation of the defense.

But even if these defenses must be regarded as distinct, the same result should follow in this case.

In critically reviewing the case of *Schlemmer* v. *R. R.,* *supra,* the Central Law Journal (3 May, 1907), thus clearly

points out the distinction generally recognized, between assumption of risk and contributory negligence.

"One has to do with the contract between master and servant, the other with the latter's own deliberate act and judgment independent of any contract requirement of the master. If a master tells a servant to do such and such a thing, and the servant sees the danger, or knows the defects of the appliances used, and the liability he is incurring, his undertaking to comply with his master's wishes is an assumption of the risks involved. It may be negligence on his part to do what he is doing, but it is negligence assumed by contract with his master, and of which his master has or ought to have knowledge. On the other hand, where a servant in the course of his employment does an act not demanded or called for by his master, and especially against the doing of which he is warned, and such act is clearly an act of negligence, the commission of such an act on his part amounts to contributory negligence, and is effective as a complete defense to a defendant in an action for damages."

Tested even by this distinction, the question whether the plaintiff assumed the risk, or was guilty of contributory negligence was, in this case, proper for the jury.

For these reasons I dissent.